**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

KAREN BRIGGS,                            )
                                         )
                    Plaintiff,           )
                                         )       Civil Action No. 12-957
          v.                             )
                                         )       Judge Nora Barry Fischer
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
                    Defendant.           )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Karen Briggs ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 – 433 ("Act").  This matter comes before the court on cross motions for summary judgment.  (ECF Nos. 10, 12).  The record has been developed at the administrative level.  For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

### II.   PROCEDURAL HISTORY

Plaintiff applied for DIB on June 26, 2009, claiming a disability onset of January 23, 2009.  (R. at 112 – 15).[1]  At the outset, she claimed that her inability to work full-time allegedly

---

[1]       Citations to ECF Nos. 7 – 7-12, the Record, *hereinafter*, "R. at __."

stemmed from depression, post-traumatic stress disorder, anxiety, and panic attacks.  (R. at 129).

Plaintiff was initially denied benefits on November 10, 2009.  (R. at 73 – 77).  Per the request of

Plaintiff, an administrative hearing was held on March 7, 2011.  (R. at 47 – 68).   Plaintiff

appeared to testify, represented by counsel, and a neutral vocational expert also testified.  (R. at

47 – 68).  At that time, Plaintiff amended her disability claim to include stenosis of the lumbar

spine.  (R. at 49 – 51).  In a decision dated April 20, 2011, the ALJ denied Plaintiff the benefits

sought.  (R. at 10 – 21).  Plaintiff filed a request for review of the ALJ's decision by the Appeals

Council, but this request was denied on June 5, 2012, thereby making the decision of the ALJ the

final decision of the Commissioner.  (R. at 1 – 3).

Plaintiff filed her Complaint in this court on July 12, 2012.  (ECF No. 3).  Defendant

filed his Answer on October 1, 2012.  (ECF No. 6).  Cross motions for summary judgment

followed.  (ECF Nos. 10, 12).  The matter has been fully briefed, and is ripe for disposition.


**III.   STATEMENT OF FACTS**

A.  General Background

Plaintiff was born on August 8, 1956, and was fifty four years of age at the time of her

administrative hearing.  (R. at 125).  She was a high school graduate with twenty-eight years of

work experience as a rural letter carrier for the United States Postal Service.  (R. at 51).  Plaintiff

retired from the Postal Service in January 2009.  (R. at 130).  Her only other work experience

was as a floor worker for a retail store between August 2007 and February 2008.  (R. at 130).

Plaintiff lived independently in a mobile home.  (R. at 55).  She had three adult children, and a

sister who lived next door.  (R. at 55, 308).

At the time of her application for benefits, Plaintiff alleged that she opted to retire from

work early because of the environment.  (R. at 129, 143).  She had not been laid off or terminated due to problems getting along with others.  (R. at 142).  She also claimed that she could not be around people, crowds, or strangers, she could not cope with stress or confrontations, she was extremely nervous, had severe depressive episodes, had emotional breakdowns, had poor concentration, and had difficulty sleeping.  (R. at 129, 137, 139).

Yet, Plaintiff was capable of engaging in normal activities of daily living, including cooking, cleaning, laundry, yard work, and grocery shopping.  (R. at 138 – 39).  She had no issues with self-care.  (R. at 137).  Plaintiff went bowling with her daughter twice a week.  (R. at 140).  She frequently emailed her friends and children, because she disliked using the telephone.  (R. at 140).  She could handle simple financials, but claimed that she had at one point become so overwhelmed with bills that she lost her house.  (R. at 139 – 40).

B.  Mental Treatment History

The record demonstrates that Plaintiff engaged in psychiatric treatment with Mona Mikhail, M.D. beginning in December 2007, through her latest treatment in March 2011.  (R. at 251, 374).  In an initial diagnostic assessment, Dr. Mikhail noted that Plaintiff recounted having begun experiencing problems with a confrontational co-worker several years prior.  (R. at 251).  Plaintiff's supervisor did nothing to mitigate the situation, and the work environment became hostile.  (R. at 251).  As a result, Plaintiff claimed that she became anxious, depressed, fearful, and angry, had difficulty concentrating, dreaded going to work, and even experienced some suicidal ideation.  (R. at 251 – 52).

Plaintiff's sleep was good, however, and her appetite was adequate.  (R. at 251).  She was observed to be well-groomed and cooperative, and exhibited intact thought processes, no hallucinations, no impairment in self-perception, full orientation, intact memory, intact cognitive

functioning, intact abstraction, and good impulse control.   (R. at 254).   Yet, she was also hyperactive, labile, depressed and anxious, had excessive speech, and had persecutory delusions. (R. at 254).   Dr. Mikhail diagnosed major depressive disorder, and anxiety NOS.   (R. at 255). Plaintiff was prescribed Neurontin.   (R. at 255).

At a follow-up in January 2008, Plaintiff reported doing well on her new medication; her anxiety was better, her sleep was better, she was not dwelling on things, and she had no panic attacks.   (R. at 249).   Plaintiff experienced no side effects from her medication, and the Neurontin dosage was increased.   (R. at 249).   The following month, Plaintiff reported "doing very well," and that it was "the best she felt since early childhood."   (R. at 292).   Plaintiff had no panic attacks, no depression, and no anxiety.   (R. at 292).   She was sleeping well at night.   (R. at 292).   In April 2008, Dr. Mikhail found that Plaintiff had responded well to treatment with Neurontin.   (R. at 246).   Plaintiff did experience some ups and downs with depression related to certain co-workers, but endorsed feeling fine, overall, and was able to manage the stress of work. (R. at 246).

Plaintiff was not seen again until June 2008.   (R. at 345).   At that time, Dr. Mikhail felt that Plaintiff was doing "fine" on Neurontin, and that her anxiety was generally under control. (R. at 245).   Plaintiff was more "even keel."   (R. at 245).   Her sleep, energy, and appetite were ok, and she had no medication side effects.   (R. at 245).   In July 2008, despite not getting along with her supervisor, Plaintiff's prescription medication had helped her tremendously in reducing anxiety and mood swings, and eliminating panic attacks.   (R. at 289).   Plaintiff's affect was bright, and she had experienced no medication side effects.   (R. at 289).

In October 2008, Plaintiff was again noted to be doing "really well."   (R. at 288).   Her sleep, energy, and concentration were all good.   (R. at 288).   She had no mood swings, no

anxiety, and no panic attacks.  (R. at 288).  She was getting along with people at work, and was going to be able to take an early retirement.  (R. at 288).  She was continued on Neurontin, and had experienced no medication side effects.  (R. at 288).  Dr. Mikhail made nearly identical findings at sessions in January 2009, June 2009, and September 2009.  (R. at 241, 243, 285).  Plaintiff was happy, spending time with her grandchildren, and was planning a vacation to Disneyland.  (R. at 241).

On November 4, 2009, Michael Crabtree, Ph.D. completed a psychiatric evaluation of Plaintiff on behalf of the Bureau of Disability Determination.  (R. at 256 – 62).  Plaintiff arrived on-time to her examination, and was driven by a neighbor.  (R. at 256 – 62).  She claimed that she no longer drove due to anxiety.  (R. at 256 – 62).  She informed Dr. Crabtree that she had taken early retirement from the Postal Service due to anxiety, as well.  (R. at 256 – 62).  Plaintiff had initially engaged in psychiatric treatment due to difficulty with co-workers.  (R. at 256 – 62).  She alleged being "picked-on" after defending another co-worker.  (R. at 256 – 62).  Her supervisor did not try to remediate the situation.  (R. at 256 – 62).  Plaintiff had continued with treatment since retirement for lingering mental health issues.  (R. at 256 – 62).

Plaintiff complained of a high level of anxiety.  (R. at 256 – 62).  She stated that she had not slept well the three nights prior to her examination with Dr. Crabtree.  (R. at 256 – 62).  She claimed to worry about everything, that she was depressed and uninterested in activity, and that her sleep was generally disturbed.  (R. at 256 – 62).  She denied fatigue.  (R. at 256 – 62).  She explained that she struggled with guilt, and had trouble concentrating and suicidal thoughts.  (R. at 256 – 62).  Her symptoms were exacerbated by her work situation.  (R. at 256 – 62).

Dr. Crabtree observed that Plaintiff demonstrated adequate attention to personal care and hygiene and was very clean and neatly dressed.  (R. at 256 – 62).  She was cooperative and self-

sufficient throughout the examination.  (R. at 256 – 62).  She did show some evidence of anxiousness during the examination in terms of nervous leg movement.  (R. at 256 – 62).  Her stream of thought was adequate, she could answer questions well, tie thoughts together well, and had no language impairments.  (R. at 256 – 62).  There was no evidence of true obsessions or phobias.  (R. at 256 – 62).  She had at least average intelligence and a rich vocabulary.  (R. at 256 – 62).  Her abstract thinking was reality-based and appropriate.  (R. at 256 – 62).  Her concentration during the examination was adequate.  (R. at 256 – 62).  She could stay on-task. (R. at 256 – 62).  Plaintiff was well-oriented, had adequate memory, good impulse control, very good judgments, and was able to present herself as a confident, self-assured, and knowledgeable individual.  (R. at 256 – 62).  She answered questions about hypothetical social situations well. (R. at 256 – 62).

It was believed by Dr. Crabtree that Plaintiff masked a very anxious and insecure persona, and had difficulty trusting those with whom she was not close.  (R. at 256 – 62).  Her concentration, persistence, and pace would be negatively impacted by her anxiety, and her social functioning in real-life situations would be below average.  (R. at 256 – 62).  Dr. Crabtree diagnosed recurrent, moderate major depressive disorder and generalized anxiety disorder.  (R. at 256 – 62).  Plaintiff's prognosis was questionable, although she could see improvement with a good behavioral therapist.  (R. at 256 – 62).

Dr. Crabtree's specific functionality assessment included findings of a marked degree of limitation in interacting with the public, co-workers, and supervisors.  (R. at 256 – 62).  She had moderate limitation with respect to understanding, remembering, and carrying out detailed instructions, and responding appropriately to changes in a routine work setting.  (R. at 256 – 62).

She was otherwise only slightly limited.  (R. at 256 – 62).  She was capable of managing her own benefits.  (R. at 256 – 62).

State agency evaluator John Rohar, Ph.D. completed a Mental Residual Functional Capacity Assessment ("RFC") of Plaintiff on November 10, 2009.  (R. at 263 – 66).  Based upon his review of the medical record, Dr. Rohar concluded that Plaintiff experienced severe impairment in terms of affective disorders and anxiety-related disorders.  (R. at 263 – 66).  His specific functional limitations findings included moderate limitation in the ability to understand, remember, and carry out detailed instructions, work in coordination with or proximity to others without being distracted, complete a normal work day and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instruction and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, responding appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation.  (R. at 263 – 66).  Plaintiff was otherwise found to be not significantly limited.  (R. at 263 – 66).

Dr. Rohar nonetheless believed that Plaintiff would be capable of performing work on a full-time basis due to intact memory processes, ability to make simple decisions, ability to ask simple questions and accept instruction, and ability to function in production-oriented jobs requiring little independent decision making.  (R. at 263 – 66).  He opined that Dr. Crabtree's more severe findings of limitation were overestimates of Plaintiff's limitations, and were based primarily upon subjective complaints lacking in credibility.  (R. at 263 – 66).

Dr. Mikhail found that Plaintiff did experience an uptick in depression and anxiety in November 2009.  (R. at 284).  She was not going out on her own.  (R. at 284).  Plaintiff was

7

otherwise unremarkable.  (R. at 284).  She had no medication side effects and was continued on

Neurontin.  (R. at 284).  Dr. Mikhail also added Zoloft to the prescription regimen.  (R. at 284).

The following month, the addition of Zoloft had provided significant relief.  (R. at 283).

By March 2010, Dr. Mikhail noted Plaintiff to be well-groomed, cooperative, calm, and

appropriate.  (R. at 282).  She had a stable mood, intact thought processes, normal speech, intact

memory, intact concentration, intact abstraction, good impulse control, no delusions or

hallucinations, and full orientation.  (R. at 282).  Dr. Mikhail's findings were largely the same in

July 2010, August 2010, and November 2010.  (R. at 280 – 81, 376).  Some fluctuation in

speech, affect, and mood were noted, but Plaintiff was generally found to feel better, have less

anxiety, have greater stability, and have few to no mood swings.  (R. at 280 – 81, 376).  She was

continued on Neurontin and Zoloft.  (R. at 280 – 81, 376).

In February 2011, an increase in depression was noted, and was attributed by Plaintiff to

the season.  (R. at 375).  By March 2011, however, Plaintiff was again noted to be well-groomed,

cooperative, calm, appropriate, and euthymic.  (R. at 374).  Her thought processes were intact,

her speech was normal, her memory was intact, her concentration was intact, her impulse control

was good, her abstraction was intact, she had no hallucinations or delusions, and she was fully

oriented.  (R. at 374).  Dr. Mikhail noted that Plaintiff's "depression is better."  (R. at 374).

C.  Physical Treatment History

Plaintiff's primary care physician was Nancy Park, M.D.  Dr. Park examined Plaintiff in

April 2009 for complaints of a sore throat.  (R. at 234 – 35).  She found that Plaintiff's

psychiatric condition was "normal," and that she was alert and articulate.  (R. at 234 – 35).  Dr.

Park examined Plaintiff again in March 2010 for an upper respiratory infection.  (R. at 299 –

300).  Plaintiff was alert and articulate, and had no neurological or musculoskeletal issues upon

examination.  (R. at 299 – 300).  She was provided with a prescription antibiotic.  (R. at 299 – 300).

Plaintiff presented to Dr. Park again in December 2010 to "fill paperwork out."  (R. at 315 – 16).  At that time, Dr. Park indicated that Plaintiff had trouble with sleep, depression, anxiety, sociability, panic, stress, irritability, restlessness, labile mood, crying, anhedonia, and low self-esteem.  (R. at 315 – 16).  Plaintiff was noted to have difficulty with leaving her home.  (R. at 315 – 16).  She was diagnosed with major depression, anxiety, and stress.  (R. at 315 – 16).  Upon examination, Dr. Park also included normal neurological and musculoskeletal findings.  (R. at 315 – 16).

On February 17, 2011, Plaintiff was seen by Dr. Park for complaints of severe leg pain – particularly on the left.  (R. at 313 – 14).  Plaintiff alleged two to three months of sore muscles, but not joint pain.  (R. at 313 – 14).  Plaintiff was noted to have a weight bearing/gait problem, but not neck or back pain.  (R. at 313 – 14).  She was also noted to suffer from anxiety and stress.  (R. at 313 – 14).  However, her memory was intact, she had normal judgment and insight, she had normal attention, she had normal affect, and she was fully oriented.  (R. at 313 – 14).  Plaintiff's diagnoses included depression, although she was not noted to be depressed that day.  (R. at 313 – 14).  Plaintiff was also diagnosed with myalgias of the lower extremities, and was to see a neurologist.  (R. at 313 – 14).

Plaintiff was examined by neurologist Kelly Kay, D.O. in February 2011.  (R. at 324 – 25).  She noted Plaintiff's complaints of abnormal sensations in her left arm and leg beginning approximately one year prior.  (R. at 324).  The pain was intermittent in nature.  (R. at 324).  Plaintiff described jolts in her left arm, neck discomfort, aching in both legs, tightness of the muscles, difficulty with stairs, some low back pain, and coldness of the feet.  (R. at 324).  Upon

examination, Dr. Kay observed Plaintiff to be very pleasant, and to exhibit a normal fund of knowledge, intact concentration and attention, intact memory, and intact speech.  (R. at 324 – 25).  Plaintiff showed no abnormal movements, had normal muscle tone and bulk in the upper and lower extremities, had normal strength and reflexes in the upper and lower extremities, intact sensation in the upper and lower extremities, stable gait with normal movement, normal heel and toe walking, and no tenderness at tender points.  (R. at 325).   Dr. Kay did not find evidence of large fiber or small fiber neuropathy.  (R. at 325).  Plaintiff was ordered to have an MRI of the cervical spine, and an EMG of the left arm and bilateral lower extremities.  (R. at 325).  Plaintiff was also prescribed Prednisone.  (R. at 325).

Plaintiff returned to Dr. Kay on March 1, 2011.  (R. at 320 – 21).  Since her last visit, Plaintiff's complaints of pain in the C7 distribution and left S1 distribution of the spine had resolved.  (R. at 320).  Plaintiff no longer had radicular-type pain in the left arm.  (R. at 320). Left leg pain had also resolved.  (R. at 321).  Stinging numbness in Plaintiff's feet had decreased. (R. at 320).  Despite continued complaints of aching and stiffness in the legs that allegedly made walking and stair climbing difficult, and aching in the hip and shoulder girdles, Plaintiff did not take the prescribed Prednisone.  (R. at 320 – 21).  Plaintiff's muscle bulk was normal, her strength was full, and her reflexes were intact.  (R. at 320).

Plaintiff's cervical spine MRI showed evidence of disk bulging at numerous levels as well as minimal disk protrusion at C7 – T1, with right foraminal narrowing – although the cord was intact.  (R. at 320).  The EMG test was normal; there was no evidence of radiculopathy of the cervical or lumbosacral spine, nor was there evidence of large fiber neuropathy or entrapment neuropathy.  (R. at 321).  There was potential, but unlikely, small fiber neuropathy.  (R. at 321). Plaintiff was advised to consider physical therapy.  (R. at 321).  An MRI of the lumbar spine was

ordered.  (R. at 321).

Plaintiff had her MRI of the lumbar spine on March 8, 2011.  (R. at 372).  There were abnormalities at the L3, L4, L5, and S1 levels of the spine.  (R. at 372).  Moderately severe degenerative joint disease was noted, but only slight to mild narrowing, diffuse disk bulging, and some endplate osteophyte formation.  (R. at 372).  Dr. Kay thereafter indicated that Plaintiff's radicular pain in the left leg had dissipated, and that she would be referred to pain management if shooting/shocking pain of the left leg was noted in the future.  (R. at 372).

D.  Administrative Hearing

Plaintiff appeared at her hearing using a cane to ambulate, and alleging the recent onset of severe pain, cramping, and numbness in her legs – particularly on the left.  (R. at 53, 61 – 62).  It began around October 2010.  (R. at 60).  It was progressively worsening.  (R. at 62).  Plaintiff was not prescribed a cane by any doctor, nor was one recommended.  (R. at 62 – 63).  Plaintiff purchased the cane of her own accord due to alleged difficulty walking inclines and stairs.  (R. at 62 – 63).  She indicated that she had an MRI of her lumbar back scheduled after her administrative hearing.  (R. at 49 – 50).  She mentioned that she also had an upcoming appointment with a rheumatologist.  (R. at 59).

In terms of her mental health, anxiety and depression were Plaintiff's most significant impairments.  (R. at 54).  She was visibly trembling at the hearing, due to anxiety.  (R. at 67).  Much of her trouble began while working at the post office, and having to deal with co-workers she considered to be "bullies."  (R. at 58).  Plaintiff testified that she had better days and worse days, but mostly worse – at least three to four days a week.  (R. at 63 – 63).  She did not believe that she ever had good days.  (R. at 63).  She frequently lacked the desire to get out of bed.  (R. at 63).  She also isolated herself from others.  (R. at 64).  She had difficulty coping with stress,

paced frequently, experienced increases in heart rate, and suffered headaches. (R. at 54). She claimed to sleep poorly. (R. at 54).

In response to questioning regarding Dr. Mikhail's notes indicating that in August of 2010 Plaintiff reported feeling stable, did not have mood swings, and experienced only some anxiety, Plaintiff stated that her current mental state was relatively unchanged. (R. at 55). Plaintiff explained that she saw Dr. Mikhail for treatment on an as-needed basis – sometimes once per month, and sometimes once every three months. (R. at 52). She was currently being prescribed Neurontin and Zoloft. (R. at 52). She was capable of driving short distances, such as to the grocery store, but preferred not to drive. (R. at 52, 56 – 57). She lost interest in most activities, but spent much of her time trying to organize her personal affects. (R. at 55). Plaintiff was planning on taking a vacation to Disneyland. (R. at 53 – 54). She would babysit one of her grandchildren in the evenings. (R. at 56). Although Plaintiff had a personal computer, she rarely used it. (R. at 60). She stopped using it for email, and told her children that she preferred to communicate via the telephone. (R. at 60).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience would be capable of performing any full-time jobs in the national economy in existence in significant numbers, if limited to light exertional work of a simple, repetitive nature, not involving interaction with the general public or close interaction and cooperation with co-workers. (R. at 65).

The vocational expert replied in the affirmative, concluding that a person with such limitations would be capable of working full-time as a "sorter," with 300,000 positions available in the national economy, as a "marker," with 260,000 positions available, or as an "assembler of

small parts," with 250,000 positions available.  (R. at 66).  The vocational expert went on to explain that such an individual would be expected to be on-task at least eighty five to ninety percent of any given work day, and could miss no more than half a day of work per month.  (R. at 67).

## IV.  STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986).  When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability.  20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003).  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age,

education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[2], 1383(c)(3)[3]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the

---

[2]     Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3]     Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).


## V.   DISCUSSION

In his decision, the ALJ concluded that Plaintiff suffered medically determinable severe impairments in the way of myofascial pain, obesity, major depressive disorder, and generalized anxiety disorder. (R. at 12). The ALJ determined that such impairments would limit Plaintiff to light exertional work requiring tasks of a simple, repetitive nature, no interaction with the general public, and no close interaction or cooperation with co-workers. (R. at 14). Based upon the testimony of the vocational expert, the ALJ concluded that even with such limitations, Plaintiff was eligible for a significant number of full-time jobs in existence in the national economy. (R. at 16 – 17). As such, Plaintiff was not entitled to DIB.

Plaintiff objects to this determination by the ALJ, arguing that he erred in failing to account for Plaintiff's need for a cane in his hypothetical and RFC assessment, in failing to include limitations related to Plaintiff's ability to work with supervisors and maintain concentration, persistence, and pace in his hypothetical and RFC assessment, and in failing to give Plaintiff's subjective complaints full credibility. (ECF No. 11 at 6 – 13). Defendant

counters that the ALJ properly rejected inclusion of an accommodation for Plaintiff's use of a cane in his hypothetical and RFC, because the record did not support a need for the cane's use. (ECF No. 13 at 10 – 12).    Further, the ALJ did not need to include a limitation regarding Plaintiff's ability to interact with a supervisor, or an additional limitation respecting Plaintiff's difficulties with concentration, persistence, or pace, because the record did not demonstrate a need for such accommodations.  (*Id.* at 12 – 15).  Finally, Plaintiff's subjective claims were not entitled to full credibility, because said claims were not consistent with the objective medical evidence.  (*Id.* at 8 – 10).  For the following reasons, the court finds Defendant's arguments to be persuasive.

Plaintiff attempts to argue that Plaintiff's relatively recent use of a cane for ambulation should have been accommodated by the ALJ, and that the medical record supports its use. However, as noted by the ALJ, neither Plaintiff's diagnostic testing results, nor the findings of her treating physicians support such a need.  Plaintiff was referred to Dr. Kay for a neurology consult, and Dr. Kay found that the EMG study was normal, and the cervical and lumbar spine MRI's ruled out radiculopathy and neuropathy.  (R. at 12 – 13).  Dr. Kay further reported that Plaintiff was neurologically intact – she had normal muscle tone and bulk, and her gait was normal.  (R. at 13).  The ALJ's review of the medical record revealed no medical notes indicating the need for a cane.  (R. at 12 – 13).

The ALJ is required to assess the intensity and persistence of a claimant's pain, and determine the extent to which it impairs a claimant's ability to work.  *Hartranft v. Apfel*, 181 F. 3d 358, 362 (3d Cir. 1999).  This includes determining the accuracy of a claimant's subjective complaints of pain.  *Id.*  However, while pain itself may be disabling, and subjective complaints of pain may support a disability determination, allegations of pain suffered must be consistent

with the objective medical evidence on record.  *Ferguson v. Schweiker*, 765 F. 2d 31, 37 (3d Cir.

1985); *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 122 (3d Cir. 2000).   Here, Plaintiff's

claimed need for a cane for stability receives no objective support from the record.  In fact, it is

contradicted by Dr. Kay's findings that Plaintiff's gait was stable, and her extremities had full

strength and normal muscle tone/bulk.  The ALJ's decision not to accommodate Plaintiff's use of

a cane in his hypothetical and RFC was, therefore, supported by substantial evidence.

Plaintiff next argues that the ALJ failed to properly discuss certain findings of limitation

by Dr. Crabtree and Dr. Rohar.   In terms of Dr. Rohar's finding of moderate limitation with

respect to concentration, persistence, and pace, as noted by the ALJ in his opinion, more than one

source indicated that Plaintiff's concentration was good – particularly her long treating

psychiatrist, Dr. Mikhail.  (R. at 12).  Dr. Crabtree noted in his evaluation that during Plaintiff's

examination, her concentration, persistence, and pace were adequate.  (R. at 14).

Plaintiff cites to *Ramirez v. Barnhart*, 372 F. 3d 546 (3d Cir. 2004), for the proposition

that the ALJ's provision of limitation to "simple, repetitive tasks" in his hypothetical and RFC

was absolutely insufficient to accommodate Plaintiff's moderate limitation in concentration,

persistence, and pace.  As noted by the court in *Ramirez*, it was not appropriate for the ALJ to

have omitted greater accommodation for a deficiency in concentration, persistence, and pace,

which was experienced "often."  *Id.* at 554.  The *Ramirez* court indicated that there may have

been a valid reason for the ALJ to omit greater accommodation if the record demonstrated that

the deficiency in pace was so minimal it would not limit the ability to perform simple tasks.  *Id.*

at 555.  The court rejected that possibility because the record in *Ramirez* did not support it.  *Id.* at

555.

The record here, however, is distinguishable.  The greater part of Plaintiff's treatment record indicated that she did not suffer from deficiencies in concentration or attention.  There is no evidence provided by Plaintiff which lends support to the idea that a limitation to simple, repetitive work would not be an adequate accommodation for Plaintiff's issues with concentration, persistence, or pace.  *See Galvin v. Comm'r of Soc. Sec.*, 2009 WL 2177216 at *10 (W.D. Pa. July 22, 2009) (simply because deficiencies in concentration, persistence, or pace were found by the ALJ, the court will not require a more specific RFC finding if the record does not support such a need).  As such, the court sees no reason to remand for reconsideration of this issue.

In terms of Plaintiff's ability to interact with supervisors, Dr. Crabtree indicated that she would have marked limitation, and Dr. Rohar believed that she would have experienced moderate limitation.  With respect to Dr. Crabtree's finding of marked limitation, the ALJ rejected the finding, because he found Plaintiff's subjective complaints, upon which Dr. Crabtree relied in making the above determination, to be without credibility, and because Plaintiff's work history demonstrated that in spite of having issues with her supervisor at the post office, Plaintiff was able to work and was not terminated.  (R. at 14 – 15).  Dr. Rohar's evaluation supported this conclusion, stating that Plaintiff was not as limited as Dr. Crabtree opined, and that Plaintiff was capable of accepting and carrying out simple instructions.  (R. at 16).

Further, even if Dr. Rohar's finding of moderate limitation may have been entitled to inclusion in the ALJ's hypothetical and RFC, its omission was – at most – harmless error.  As discussed by the ALJ, Dr. Rohar concluded that Plaintiff was capable of full-time work even with the inclusion of moderate limitations in the ability to interact with the public, co-workers, and supervisors.  (R. at 16, 265).  Additionally, Plaintiff fails to demonstrate how inclusion of a

moderate limitation respecting Plaintiff's ability to interact with supervisors could have changed the disposition of the claim.  Remand on such a basis is not justified.  *Shinseki v. Sanders*, 556 U.S. 396, 409 – 10 (2009) ("burden of showing that an error is harmful normally falls upon the party attacking the agency's determination").

Lastly, the court considers Plaintiff's contention that the ALJ improperly accorded lessened weight to Plaintiff's subjective claims.  Plaintiff's long work history and compliance with her treatment regimen are argued to support her subjective claims.  Contrary to Plaintiff's assertion, the ALJ did – in fact – consider Plaintiff's "history of successful employment in the Postal Service for many years."  (R. at 15).  Also contrary to Plaintiff's arguments, the ALJ did not attempt to use Plaintiff's statements that she was planning a vacation to Disneyland, that she was happy and enjoying time with her grandchildren, and that she could perform household duties as evidence that she could work a full-time job, but – as Plaintiff asks the court to do – as evidence of Plaintiff's functional capabilities.   Apparently, Plaintiff would like this court to consider only Plaintiff's negative subjective claims of her functioning, and ignore her positive testimony.  This, the court is not inclined to do.

An ALJ must give a claimant's subjective description of his or her inability to perform light or sedentary work serious consideration when this testimony is supported by competent evidence.  *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).   This necessitates a determination by the ALJ as to the extent to which a claimant is accurately stating the degree of his disability.  *Hartranft*, 181 F. 3d at 362 (citing 20 C.F.R. § 404.1529(c)).  This was exactly what the ALJ was doing when discussing Plaintiff's subjective testimony regarding her activities of daily living.   The ALJ found numerous inconsistencies between Plaintiff's subjective complaints and the objective medical record.  (R. at 12 – 16).  He also often found her

statements to be contradictory.  (R. at 12 – 15).  There was no error committed in the ALJ's use of Plaintiff's own subjective claims to determine Plaintiff's degree of functionality.

## VI.   CONCLUSION

Based upon the foregoing, the decision of the ALJ is adequately supported by substantial evidence from Plaintiff's record.  Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed.  Appropriate Orders follow.

_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Dated: February 19th, 2013
cc/ecf: All counsel of record.